## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 17-19 (RMC)** |
| | : | |
| **SHEILA SCUTCHINGS,** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

## GOVERNMENT MEMORANDUM IN AID OF SENTENCING

The United States, by and through undersigned counsel, respectfully submits this memorandum in aid of sentencing for Sheila Scutchings ("Defendant"). From January 2008 through April 2012, Defendant made a living by defrauding the United States government, with her and her closest co-conspirators combining to steal more than $1.8 million from American taxpayers. The government recommends the Court impose a Guidelines sentence on Defendant of sixty months on Count One and twenty-four months on Count Three, to run consecutively, in addition to a period of supervised release.

### I.      PROCEDURAL BACKGROUND

On January 31, 2017, a grand jury issued a three-count Indictment charging Defendant with, in Count One, conspiracy to defraud the United States and commit theft of public money, in violation of 18 U.S.C. § 371, in Count Two, theft of public money, in violation of 18 U.S.C. § 641, and in Count Three, aggravated identity theft, in violation of 18 U.S.C. § 1028A. (Doc. 1). The indictment also contained a forfeiture

allegation, seeking the forfeiture of all property which constitutes or is derived from proceeds traceable to the offenses laid out in Counts One and Two. (Doc. 1).

On the morning on which trial was set to begin, December 3, 2018, Defendant decided to plead guilty, and entered guilty pleas to Counts One and Three of the Indictment. That day, the government and defense counsel negotiated a plea agreement, which was filed on December 4, 2018. (Doc. 37). As part of the plea agreement, the government agreed to move to dismiss Count Two of the Indictment at sentencing. (Doc. 37 at 2).

## II.    FACTUAL BACKGROUND

Defendant, together with Co-Conspirator B, organized and led a scheme in which hundreds of fraudulent federal income tax returns were submitted to the IRS from 2008 through 2012. The IRS was duped into issuing refunds in response to 650 of those fraudulent returns. Defendant received the majority of the refunds at her own home or at various addresses she controlled. She then cashed or deposited those checks in her own bank account, in other bank accounts she controlled, or at check cashing businesses.

Defendant was integral to each step of the conspiracy. The first step necessary to the scheme was the acquisition of names and Social Security numbers so that the individuals whose identifying information was acquired could be listed as the purported taxpayer on fraudulent returns. Defendant personally solicited individuals' personal information for use on the tax returns. (Doc. 38 ¶15). Next, of course, the tax returns themselves needed to be prepared. Again, Defendant herself

prepared false tax returns using the names and Social Security numbers she had obtained. (Doc. 38 ¶16).

It was critical to the conspiracy that the fraudulent returns listed a variety of different addresses, as the conspirators were concerned that filing too many returns from any one address might draw the attention of the IRS. However, at the same time, the addresses listed could not be the true addresses of the purported taxpayers in whose names the tax returns were filed – otherwise, the purported taxpayers, rather than the co-conspirators, would receive the money. Accordingly, Defendant listed her own address as the taxpayer address on more than 70 fraudulent tax returns during the years at issue, so that she could directly collect the refund checks issued based on those returns. However, she also listed as the taxpayer addresses on various returns at least six other addresses she controlled, including the addresses of four of her relatives and two of her neighbors. (Doc. 38 ¶17). Ultimately, the IRS issued refunds in response to the vast majority of fraudulent returns submitted as part of the scheme, as follows:

| Mailing Address | Number of Checks | Amount |
|---|---|---|
| Defendant's Home | 74 | $193,035.53 |
| Other Addresses Defendant Controlled | 302 | $884,767.86 |
| Addresses Co-Conspirator B Controlled | 274 | $729,072.67 |
| Total | 650 | $1,806,876.06 |

The neighbors and relatives whose addresses Defendant controlled were aware

of the scheme and their role in it. (Doc. 38 ¶17). Each of them provided the fraudulently obtained refund checks mailed to their addresses to Defendant. (Doc. 38 ¶17). In return, Defendant provided them with a portion of the proceeds. (Doc. 38 ¶17). Typically, this was approximately $150 per check. (Doc. 38 ¶11).

Finally, once she had collected all of the refund checks, Defendant needed to find a way to negotiate them. Where the listed payee was complicit in the scheme and she could locate that individual, Defendant took the listed payee to a check casher, where the listed payee received a cut of the proceeds for cashing the check. (See Doc. 38 ¶20). Where the payee was unavailable or unaware of the scheme, Defendant needed to forge the payee's signature and deposit the check into a bank account she controlled. Accordingly, she deposited some of the checks she obtained into her own bank account at Bank of America. (Doc. 38 ¶18). She also, for a fee, negotiated checks she received from Co-Conspirator B, who did not have a bank account and, like Defendant, needed a way to negotiate checks without locating the payee. (Doc. 38 ¶18). In total, Defendant deposited 133 fraudulently obtained tax refund checks, totaling $396,107.26, into her personal bank account at Bank of America.[1] (Doc. 38 ¶18).

Defendant also recruited Co-Conspirator A into the conspiracy, and utilized Co-Conspirator A's bank accounts at Navy Federal Credit Union to negotiate checks she and Co-Conspirator B had obtained through execution of the scheme. (Doc. 38 ¶19). In all, Defendant and Co-Conspirator B caused the depositing of 48

---

[1] The vast majority of these checks were sent to addresses known to be controlled by Defendant or Co-Conspirator B, and are therefore included in the $1.8 million figure discussed above.

4

fraudulently obtained refund checks, worth $114,127.47, into bank accounts controlled by Co-Conspirator A. (Doc. 38 ¶19).

The entire scheme, in which Defendant was involved at every point, resulted in an agreed upon actual tax loss of $1,806,876.06, as laid out in the chart above. Notably, this tax loss figure only includes negotiated tax refund checks that were mailed to addresses known to be controlled by Defendant and Co-Conspirator B. It does not include any of the tax returns filed as part of the scheme for which the IRS did not issue a refund. Nor does it include any refunds issued to any other addresses, even where those refund checks were negotiated in Defendant's or Co-Conspirator A's bank account.

### III.    THE APPROPRIATE GUIDELINES

#### A.    Count One

As laid out in the PSR, the appropriate Guidelines range for Count One is 60 months. As the parties agreed in the plea agreement, because Defendant was convicted of conspiracy to defraud the United States and to commit theft of public money, Defendant's base offense level is 6 under U.S. Sentencing Guidelines Manual § 2B1.1(a)(2) (2018). Based on the loss amount of $1,806,876.06, she is subject to a 16-level enhancement under § 2B1.1(b)(1)(J). (Doc. 37 at 3). The parties further agreed that a 2-level enhancement is applicable under § 2B1.1(b)(2)(A)(i) because Defendant's offense involved 10 or more victims. (Doc. 37 at 3). Indeed, Defendant's offense involved over 100 victims, as Defendant and her co-conspirators filed more

than 600 tax returns using the names of other individuals.[2] The parties therefore agree that Defendant's offense level is at least 24, before taking into account any acceptance of responsibility. (Doc. 37 at 3).

At issue, then, is whether and to what extent Defendant should receive an enhancement based on her role in the conspiracy. Here, as Defendant was an organizer or leader of a criminal activity that involved five or more participants, a four-level enhancement for her role is appropriate. U.S.S.G. § 3B1.1(a). In making this determination, the Court must determine both the size and scope of the conspiracy and Defendant's role therein.

First, it is readily apparent from the statement of the offense Defendant signed that the criminal activity in which she participated involved more than five participants. A participant for the purposes of § 3B1.1 is any person who is criminally responsible for the commission of the offense, even if they were not convicted. § 3B1.1 cmt. n.1. Here, the conspiracy involved a multitude of individuals. First and most prominently, Defendant was involved at every stage of the scheme, obtaining people's personal information, preparing false tax returns, collecting the resulting checks, and negotiating them in her own bank account, in other bank accounts, and at check cashers. (Doc. 38 ¶¶15-20). Second, Co-Conspirator A received checks at her address for Defendant and negotiated checks for Defendant

[2] As this case involves the use of means of identification, the word "victim" includes any individual whose means of identification was used unlawfully or without authority. § 2B1.1 , cmt. n.4(E)(ii). Here, as there is no lawful authority to use an individual's Social Security number to file a false return, every individual whose name was used on the tax returns is a victim for the purposes of this enhancement. United States v. Reynolds, 710 F.3d 434 (D.C. Cir. 2013). This case also involved a number of individuals who were not aware that their information was being used to file false tax returns.

using her bank accounts at Navy Federal Credit Union. (Doc. 38 ¶19). Third, Co-Conspirator B, like Defendant, controlled various addresses, collected the checks, and caused their negotiation. (Doc. 38 ¶¶18, 19). Fourth, four of Defendant's relatives, including Co-Conspirator A, who had knowledge of the scheme, received scheme checks at their residences and provided them to Defendant in exchange for a share of the proceeds; and two of Defendant's neighbors, who likewise had knowledge of the scheme, received scheme checks at their residences and provided them to Defendant in exchange for a share of the proceeds. (Doc. 38 ¶17) In addition, four individuals who were cognizant of the scheme provided checks to Co-Conspirator B as part of the scheme.[3] In all, then, the scheme involved at least twelve participants.[4]

Next, the Court must determine whether, within that conspiracy, Defendant was an organizer or leader, a manager or supervisor, or none of the above. To qualify for an adjustment under § 3B1.1, Defendant "must have been the organizer, leader, manager, or supervisor of one or more other participants." § 3B1.1 cmt. n.2. Here, Defendant organized and led the six people from whom she collected checks. Those six people, Defendant's relatives and neighbors, were recruited by Defendant to enter the scheme and operated at Defendant's direction. Upon receiving checks at

---

[3] Co-Conspirator B, who pleaded guilty in 2014, has agreed to application of a three-level aggravating role enhancement based on her management and supervision of the individuals whose addresses she controlled.

[4] Even if there were not five or more participants in the scheme, the scheme would certainly qualify as "otherwise extensive" under the Guidelines. In assessing whether a criminal organization is otherwise extensive, the Court considers all persons involved during the course of the entire offense, including those whose unknowing services were used. § 3B1.1 cmt. n.3. In addition to the twelve conspirators discussed above, this case involved more than a hundred individuals whose information was used to file false tax returns.

their addresses, they did not cash the checks themselves or direct them to any third party, instead always providing them directly to Defendant. (Doc. 38 ¶17). In return, Defendant paid her neighbors and relatives a share of the proceeds of the checks. (Doc. 38 ¶17). Defendant's leadership is most clearly observed with respect to Co-Conspirator A, who was one of the six individuals who received checks at their addresses for Defendant. At Defendant's instruction, Co-Conspirator A also deposited scheme checks into various bank accounts she controlled at Navy Federal Credit Union for Defendant and Co-Conspirator B. (Doc. 38 ¶19).

Plainly, then, Defendant had an aggravating role in a criminal activity that involved five or more participants. The question is therefore whether Defendant should be characterized as an organizer or leader of the conspiracy or as a manager or supervisor. In determining which of the enhancements to apply, the Guidelines direct the Court to consider, among other factors, the nature of Defendant's participation in the commission of the offense, the recruitment of accomplices, and the degree of control and authority exercised over others. § 3B1.1 cmt. n.4. Each of these factors weighs in favor of finding Defendant to be an organizer or leader. First, the nature of Defendant's participation in the commission of the offense shows that, unlike many of the participants in the broader scheme, she was involved at every single stage of the conspiracy, from the collection of the personal identifying information to the negotiation of the resulting checks. Second, Defendant recruited a number of accomplices. Most importantly, she recruited Co-Conspirator A, who received checks at her address for Defendant and also negotiated checks into her

bank accounts at Navy Federal Credit Union at Defendant's direction. In addition, Defendant recruited other relatives and neighbors to receive checks at their addresses for Defendant and recruited individuals to provide their personal identifying information to Defendant and negotiate the resulting checks in their names at check cashing businesses. Third, Defendant exercised a full degree of control and authority over the individuals whose addresses she controlled, with the exception of Co-Conspirator A, over whom she shared control with Co-Conspirator B.

In response, Defendant argues that she was a pawn in a scheme devised by Charles Pittman. Pittman has already pleaded guilty for his role in the scheme, which involved the preparation of fraudulent tax returns for complicit clients. (1:15-cr-29, Doc. 6). Defendant and Co-Conspirator B learned how to prepare fraudulent tax returns by watching Pittman. Thereafter, Defendant and Co-Conspirator B prepared fraudulent tax returns separate and independent from any involvement by Pittman. Whatever Pittman's role, and with respect to this conspiracy it was exceedingly minimal, Defendant directed her neighbors and relatives to receive Treasury checks for her, paid them for their participation in the scheme, and likewise directed Co-Conspirator A to deposit scheme checks in her bank account. Accordingly, Defendant was an organizer and leader of a conspiracy that involved five or more participants.

Adding the resulting 4-level enhancement, Defendant has an offense level of 28. Based on Defendant's acceptance of responsibility, she is due a 2-level reduction

in offense level under § 3E1.1(a). Accordingly, Defendant's final offense level is 26. Based on a criminal history category of I, her Guidelines range would be 63-78 months. However, because the statutory maximum under 18 U.S.C. § 371 is 60 months of imprisonment, the final Guidelines range is 60 months. § 5G1.1(a).

In the plea agreement, the parties agreed that, at Guidelines level 26, the applicable fine range is $25,000 to $250,000. (Doc. 37 at 4). However, as the PSR notes, because Defendant's offense was committed prior to November 1, 2015, the applicable fine guideline range to be used is that in effect on November 1, 2014. § 5E1.2(h). Accordingly, the appropriately calculated fine range at offense level 26 in this case is $12,500 to $125,000, based on the 2014 version of § 5E1.2(c).

The parties agree that there is no reason for a departure in this case. (Doc. 37 at 4). There is also no reason for a variance from the applicable Guidelines range.

### B.   Count Three

A conviction under 18 U.S.C. § 1028A carries a mandatory two year term of imprisonment. § 1028A(a)(1). The Guidelines sentence is therefore two years of imprisonment. U.S.S.G. § 2B1.6(a). That two-year sentence on Count Three must run consecutive to whatever sentence the Court imposes on Count One. § 1028A(b)(2).

Defendant may contend that the Court should consider the mandatory sentence on Count Three when determining its sentence on Count One. Where a Court is sentencing a defendant on an aggravated identity theft charge and on the predicate offense underlying the aggravated identity theft, the Court is not

permitted to consider the sentence on the former in determining the sentence on the latter count. § 1028A(b)(3). Here, however, because Defendant pleaded guilty to the conspiracy to commit the theft of public money, rather than to the specific predicate offense underlying the aggravated identity theft count, the Court has discretion to consider the sentence on the aggravated identity theft count in determining the appropriate sentence on the conspiracy charge. United States v. Vidal-Reyes, 562 F.3d 43 (1st Cir. 2009).

While the Court therefore has discretion to do so, there are at least three reasons why the Court should not lower its sentence on the § 371 charge based on the additional § 1028A offense. First, doing so would create a strange and unwarranted sentencing disparity between individuals who plead guilty to a conspiracy to commit § 641 in addition to a § 1028A offense and those who plead guilty to a substantive § 641 offense in combination with a § 1028A offense. In the latter scenario, the Court would not be permitted to consider its sentence on the aggravated identity charge, when determining its sentence on the theft of public money charge. § 1028A(b)(3). It makes little sense that Defendant should be treated more favorably just because she pleaded guilty to the broader conspiracy to commit numerous thefts of public money, rather than to a specific theft of public money.[5]

Second, aggravated identity theft is a serious offense that should result in a higher sentence. In 2017, the Federal Trade Commission received 371,061 identity

---

[5] This distinguishes the present scenario from a case where the other count of conviction is unrelated to the aggravated identity theft count, and therefore it may be appropriate to consider the aggravated identity theft sentence in determining the sentence on the unrelated count.

theft reports, or approximately one for every thousand Americans. <u>Consumer Sentinel Network Data Book 2017: Identity Theft Reports by Type</u>, https://www.ftc.gov/policy/reports/policy-reports/commission-staff-reports/consumer-sentinel-network-data-book-2017/id-theft-reports-by-type (last visited February 13, 2019). When considering the number of victims who are not yet aware that their identities have been stolen and those who do not know to report their identity's theft to the FTC, the total number of identity theft victims in America is much higher. But identity theft is not just rampant, it is also exceedingly harmful. Individuals whose names and Social Security numbers are used to file false tax returns frequently encounter difficulties when they subsequently file legitimate returns, and their resulting refunds can be held up for months or more. A strong, additional sentence is therefore appropriate in cases that involve aggravated identity theft, to account for the additional harm caused to individual victims.

Third, as discussed <u>infra</u> Part IV, a consideration of all of the § 3553(a) factors in this case suggest that an eighty-four-month combined sentence is necessary to meet the goals of sentencing.

## IV.    A COMBINED 84-MONTH SENTENCE IS APPROPRIATE

After determining the appropriate Guidelines, the Court must consider the factors laid out in 18 U.S.C. § 3553(a) in deciding on a sentence that is sufficient but not greater than necessary to meet the goals of sentencing. Analysis of those factors confirms that a sixty-month sentence on Count One, in addition to the twenty-four-month sentence on Count Three, is appropriate.

Most importantly, the nature and circumstances of the offense and history and characteristics of the Defendant demonstrate the need for a sixty-month sentence on Count One. This case does not involve a momentary lapse of judgment. Instead, Defendant's crime was a deliberate, persistent scheme, representing a consistent choice to defraud the government over the span of more than four years. Not content with filing false returns in her own name from her own address, Defendant involved dozens of friends, neighbors, and relatives in her scheme, recruiting them to provide her with their names and Social Security numbers and enable her to use their addresses to receive checks. Defendant chose to make a living off defrauding her own government, and did not hesitate to subject those closest to her to potential prosecution in order to facilitate her scheme.

Nothing in Defendant's history and characteristics mitigates this egregious and methodical criminality. While Defendant's childhood was not idyllic, she had the good fortune to grow up in a two-parent household and, unlike so many of the defendants before the Court, neither suffered nor viewed any abuse. (PSR ¶¶67-69). She also has little in the way of a work history, having left her last job prior to the commission of the instant offenses based on an "unpleasant work environment." (PSR ¶¶91-97). Defendant's age is also far from a mitigating circumstance, as she was quite old enough upon commission of the instant offenses to know better and is still young enough to have many years in front of her after her release from prison.[6]

---

[6] To the extent Defendant contends she is a caretaker for her son, Kuron, the Court should reject that argument. Mr. Scutchings is 21 years old and therefore capable of taking care of himself. There is also currently a warrant for his arrest based on his failure to appear in court on an armed robbery charge. 2018 CF3 011887, United States v. Kuron Scutchings (D.C. Superior Ct.).

A need for general deterrence likewise advocates for a Guidelines sentence. In tax year 2012, fraudsters filed fraudulent returns using stolen identities that requested a combined total of $30 billion in refunds. See GAO August 20, 2014 Report on Identity Theft, available at http://www.gao.gov/products/GAO-14-633. While the IRS was able to prevent the issuance of checks in response to approximately 80% of those returns, stolen identity refund fraud was still a $5 billion industry in 2012. Id.

As the wider conspiracy in which this case is a part demonstrates, once a gap in the IRS's systems is discovered, its use can spread quickly and be abused for tens of millions of dollars before it is detected. By the time the resulting investigations and prosecutions are concluded, much of the money has already been spent, and is not recoverable. The IRS has in recent years added additional fraud detection mechanisms to its systems to try to prevent the issuance of refunds based on fraudulent returns, and has devoted considerable resources to criminal investigation of stolen identity refund fraud schemes. For the fiscal years 2014 through 2016, the IRS initiated approximately 2,412 identity theft-related criminal investigations. See IRS Statistical Data - Identity Theft Investigations, available at http://www.irs.gov/uac/Statistical-Data-Identity-Theft-Investigations.

Yet, investigation and identification of perpetrators can only do so much in deterring these sorts of crimes. Absent serious sentences for convicted participants, would-be fraudsters can conclude that the enormous potential financial benefits of engaging in the fraud outweigh the risk of being caught and punished. Accordingly,

it is vital that Defendant receive a sentence that sends a message to the public that profiting from the filing of fraudulent tax returns, at the expense of the American public, will be punished with a significant period of incarceration.

There is also a need for specific deterrence in this case. Defendant was initially interviewed on April 9, 2012 about her role in this conspiracy, during which interview she attempted to mitigate her involvement. On April 19, 2012, the IRS received a false tax return filed in Defendant's name from Defendant's address, requesting a refund. Thereafter, in May 2012, Defendant received and negotiated the fraudulently obtained tax refund check issued in response to the false tax return in her name. In other words, even after being approached by law enforcement about the scheme, Defendant failed to understand the gravity of the situation and instead continued to perpetrate the fraud. A lengthy sentence is necessary to ensure that Defendant takes her crimes seriously and determines not to return to a life of fraud.

A Guidelines sentence is also essential to reflect the seriousness of Defendant's offense, promote respect for the law, and provide just punishment. Defendant's fraud was extensive, involving the theft of more than $1.8 million from the United States. Unlike some fraud cases, where a defendant is liable for substantial losses over and above their own personal involvement, the loss number in this case is a fair depiction of her own involvement of the case, as it only includes the amounts of checks sent to addresses controlled by Defendant and her closest co-conspirator. By the government's estimate, Defendant's share of the profits from the scheme is

$673,551.15.[7] A substantial term of imprisonment is necessary to appropriately punish Defendant for her extended period of wrongdoing, and accurately reflect the seriousness of such a large theft from the public treasury.

A comparison of Defendant's case to those of other members in the conspiracy confirms that a Guidelines sentence would be appropriate in this case. Attached as Exhibit 1 is a chart of sentences in the wide-ranging conspiracy in which Defendant was a part. As the Court can see, half of the Defendants who were held responsible for at least $1 million worth of loss were sentenced to the low end of the Guidelines. This is true even of defendants, like Alvalonzo Graham, whose actual loss was well under $1 million. The exceptions who received sentences below the applicable Guidelines range despite losses exceeding $1 million all had extenuating circumstances. For example, Marc Bell received a sentence four months below the applicable Guidelines range. However, he waived indictment, and only personally received approximately $50,000 for his role in the scheme. (1:15-cr-190, Doc. 16 at 3). As the Court is well aware, Antonio Cooper and Delores Durham likewise had mitigating factors, not present here, that justified their below-Guidelines sentence.

Accordingly, an analysis of the § 3553(a) factors demonstrates that a sixty-month sentence on Count One is necessary to adequately meet the goals of sentencing. The government therefore respectfully suggests the Court sentence Defendant to that sixty-month term, together with the mandatory consecutive twenty-four-month term on Count Three, and the agreed-upon restitution of

---

[7] Exhibits 2 and 3 lay out the calculations underlying this estimate, which forms the basis for the consent forfeiture Order the parties will submit at sentencing.

$1,806,876.06.

Respectfully submitted,

ROSEMARY E. PAGUNI
Chief, Northern Criminal Enforcement
Section
U.S. Department of Justice Tax Division

By:      /s/ William Guappone
WILLIAM GUAPPONE
THOMAS F. KOELBL

Trial Attorneys
Department of Justice, Tax Division
N.C. Bar No. 46075
N.Y. Bar No. 4363321
601 D. Street, N.W.
Washington, D.C. 20530
(202) 616-2378

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing motion has been served via ECF upon counsel for the Defendant, Joseph Conte, Esq., this 28th day of February, 2019.

/s/ William Guappone
WILLIAM GUAPPONE
Trial Attorney
